UNITED STATES *v.* WHITE

No. 13.   Argued November 10, 1969—Reargued October 20, 1970—
Decided April 5, 1971

WHITE, J., announced the Court's judgment, and delivered an opinion in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined. BLACK, J., filed a statement concurring in the judgment, *post*, p. 754. BRENNAN, J., filed an opinion concurring in the result, *post*, p. 755. DOUGLAS, J., *post*, p. 756, HARLAN, J., *post*, p. 768, and MARSHALL, J., *post*, p. 795, filed dissenting opinions.

*Assistant Attorney General Wilson* reargued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Joseph J. Connolly, John S. Martin, Jr., Jerome M. Feit, Beatrice Rosenberg,* and *Sidney M. Glazer.*

*John L. Boeger* reargued the cause for respondent. With him on the brief were *Morris A. Shenker* and *Chauncey Eskridge.*

*Abraham Glasser* and *Maurice Edelbaum* filed a brief for John G. Broady et al. as *amici curiae* urging affirmance.

MR. JUSTICE WHITE announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join.

In 1966, respondent James A. White was tried and convicted under two consolidated indictments charging various illegal transactions in narcotics violative of 26 U. S. C. § 4705 (a) and 21 U. S. C. § 174. He was fined and sentenced as a second offender to 25-year concurrent sentences. The issue before us is whether the Fourth Amendment bars from evidence the testimony of governmental agents who related certain conversations which had occurred between defendant White and a government informant, Harvey Jackson, and which the agents

overheard by monitoring the frequency of a radio transmitter carried by Jackson and concealed on his person.[1] On four occasions the conversations took place in Jackson's home; each of these conversations was overheard by an agent concealed in a kitchen closet with Jackson's consent and by a second agent outside the house using a radio receiver. Four other conversations—one in respondent's home, one in a restaurant, and two in Jackson's car—were overheard by the use of radio equipment. The prosecution was unable to locate and produce Jackson at the trial and the trial court overruled objections to the testimony of the agents who conducted the electronic surveillance. The jury returned a guilty verdict and defendant appealed.

The Court of Appeals read *Katz* v. *United States,* 389 U. S. 347 (1967), as overruling *On Lee* v. *United States,* 343 U. S. 747 (1952), and interpreting the Fourth Amendment to forbid the introduction of the agents' testimony in the circumstances of this case. Accordingly, the court reversed but without adverting to the fact that the transactions at issue here had occurred before *Katz* was decided in this Court. In our view, the Court of Appeals misinterpreted both the *Katz* case and the Fourth Amendment and in any event erred in applying the *Katz* case to events that occurred before that decision was rendered by this Court.[2]

---

[1] White argues that Jackson, though admittedly "cognizant" of the presence of transmitting devices on his person, did not voluntarily consent thereto. Because the court below did not reach the issue of Jackson's consent, we decline to do so. Similarly, we do not consider White's claim that the Government's actions violated state law.

[2] A panel of three judges on March 18, 1968, reversed the conviction, one judge dissenting. A rehearing *en banc* was granted, and on January 7, 1969, the full court followed the panel's decision, three judges dissenting. 405 F. 2d 838.

I

Until *Katz* v. *United States,* neither wiretapping nor electronic eavesdropping violated a defendant's Fourth Amendment rights "unless there has been an official search and seizure of his person, or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure." *Olmstead* v. *United States,* 277 U. S. 438, 466 (1928); *Goldman* v. *United States,* 316 U. S. 129, 135–136 (1942). But where "eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied" by the defendant, although falling short of a "technical trespass under the local property law," the Fourth Amendment was violated and any evidence of what was seen and heard, as well as tangible objects seized, was considered the inadmissible fruit of an unlawful invasion. *Silverman* v. *United States,* 365 U. S. 505, 509, 511 (1961); see also *Wong Sun* v. *United States,* 371 U. S. 471 (1963); *Berger* v. *New York,* 388 U. S. 41, 52 (1967); *Alderman* v. *United States,* 394 U. S. 165, 177–178 (1969).

*Katz* v. *United States,* however, finally swept away doctrines that electronic eavesdropping is permissible under the Fourth Amendment unless physical invasion of a constitutionally protected area produced the challenged evidence. In that case government agents, without petitioner's consent or knowledge, attached a listening device to the outside of a public telephone booth and recorded the defendant's end of his telephone conversations. In declaring the recordings inadmissible in evidence in the absence of a warrant authorizing the surveillance, the Court overruled *Olmstead* and *Goldman* and held that the absence of physical intrusion into the telephone booth did not justify using electronic devices in listening to and recording Katz' words, thereby vio-

lating the privacy on which he justifiably relied while using the telephone in those circumstances.

The Court of Appeals understood *Katz* to render inadmissible against White the agents' testimony concerning conversations that Jackson broadcast to them. We cannot agree. *Katz* involved no revelation to the Government by a party to conversations with the defendant nor did the Court indicate in any way that a defendant has a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police.

*Hoffa* v. *United States,* 385 U. S. 293 (1966), which was left undisturbed by *Katz,* held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, "no interest legitimately protected by the Fourth Amendment is involved," for that amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa* v. *United States,* at 302. No warrant to "search and seize" is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, *Lewis* v. *United States,* 385 U. S. 206 (1966), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence. *Lopez* v. *United States,* 373 U. S. 427 (1963).

Conceding that *Hoffa, Lewis,* and *Lopez* remained unaffected by *Katz,*[3] the Court of Appeals nevertheless

---

[3] It follows from our opinion that we reject respondent's contentions that *Lopez* should be overruled.

read both *Katz* and the Fourth Amendment to require a different result if the agent not only records his conversations with the defendant but instantaneously transmits them electronically to other agents equipped with radio receivers. Where this occurs, the Court of Appeals held, the Fourth Amendment is violated and the testimony of the listening agents must be excluded from evidence.

To reach this result it was necessary for the Court of Appeals to hold that *On Lee* v. *United States* was no longer good law. In that case, which involved facts very similar to the case before us, the Court first rejected claims of a Fourth Amendment violation because the informer had not trespassed when he entered the defendant's premises and conversed with him. To this extent the Court's rationale cannot survive *Katz*. See 389 U. S., at 352–353. But the Court announced a second and independent ground for its decision; for it went on to say that overruling *Olmstead* and *Goldman* would be of no aid to On Lee since he "was talking confidentially and indiscreetly with one he trusted, and he was overheard. . . . It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here." 343 U. S., at 753–754. We see no indication in *Katz* that the Court meant to disturb that understanding of the Fourth Amendment or to disturb the result reached in the *On Lee* case,[4] nor are we now inclined to overturn this view of the Fourth Amendment.

---

[4] Other courts of appeals have considered *On Lee* viable despite *Katz*. *Dancy* v. *United States,* 390 F. 2d 370 (CA5 1968); *Long* v. *United States,* 387 F. 2d 377 (CA5 1967); *Koran* v. *United States,*

Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* 385 U. S., at 300–303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez* v. *United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States, supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. Very probably, individual defendants neither know nor suspect that their colleagues have gone or will go to the police or are carrying recorders or transmitters. Otherwise, conversation would cease and our problem with these encounters would be nonexistent or far different from those now

408 F. 2d 1321 (CA5 1969). See also *United States* v. *Kaufer,* 406 F. 2d 550 (CA2), aff'd *per curiam,* 394 U. S. 458 (1969); *United States* v. *Jackson,* 390 F. 2d 317 (CA2 1968); *Doty* v. *United States,* 416 F. 2d 887 (CA10 1968), *id.,* at 893 (rehearing 1969).

before us. Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally "justifiable"—what expectations the Fourth Amendment will protect in the absence of a warrant. So far, the law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants in the manner exemplified by *Hoffa* and *Lewis*. If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. See *Lopez* v. *United States*, 373 U. S. 427 (1963).

Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recog-

nition, particularly under the Fourth Amendment which is ruled by fluid concepts of "reasonableness."

Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

It is thus untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a "reasonable" investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an "unreasonable" and unconstitutional search and seizure. Our opinion is currently shared by Congress and the Executive Branch, Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 212, 18 U. S. C. § 2510 *et seq.* (1964 ed., Supp. V), and the American Bar Association. Project on Standards for Criminal Justice, Electronic Surveillance § 4.1 (Approved Draft 1971). It is also the result reached by prior cases in this Court. *On Lee, supra; Lopez* v. *United States, supra.*

No different result should obtain where, as in *On Lee* and the instant case, the informer disappears and is un-

available at trial; for the issue of whether specified events on a certain day violate the Fourth Amendment should not be determined by what later happens to the informer. His unavailability at trial and proffering the testimony of other agents may raise evidentiary problems or pose issues of prosecutorial misconduct with respect to the informer's disappearance, but they do not appear critical to deciding whether prior events invaded the defendant's Fourth Amendment rights.

## II

The Court of Appeals was in error for another reason. In *Desist* v. *United States,* 394 U. S. 244 (1969), we held that our decision in *Katz* v. *United States* applied only to those electronic surveillances that occurred subsequent to the date of that decision. Here the events in question took place in late 1965 and early 1966, long prior to *Katz.* We adhere to the rationale of *Desist,* see *Williams* v. *United States, ante,* p. 646. It was error for the Court of Appeals to dispose of this case based on its understanding of the principles announced in the *Katz* case. The court should have judged this case by the pre-*Katz* law and under that law, as *On Lee* clearly holds, the electronic surveillance here involved did not violate White's rights to be free from unreasonable searches and seizures.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE BLACK, while adhering to his views expressed in *Linkletter* v. *Walker,* 381 U. S. 618, 640 (1965), concurs in the judgment of the Court for the reasons set forth in his dissent in *Katz* v. *United States,* 389 U. S. 347, 364 (1967).

MR. JUSTICE BRENNAN, concurring in the result.

I agree that *Desist* v. *United States,* 394 U. S. 244 (1969), requires reversal of the judgment of the Court of Appeals. Therefore, a majority of the Court supports disposition of this case on that ground. However, my Brothers DOUGLAS, HARLAN, and WHITE also debate the question whether *On Lee* v. *United States,* 343 U. S. 747 (1952), may any longer be regarded as sound law. My Brother WHITE argues that *On Lee* is still sound law. My Brothers DOUGLAS and HARLAN argue that it is not. Neither position commands the support of a majority of the Court. For myself, I agree with my Brothers DOUGLAS and HARLAN. But I go further. It is my view that the reasoning of both my Brothers DOUGLAS and HARLAN compels the conclusion that *Lopez* v. *United States,* 373 U. S. 427 (1963), is also no longer sound law. In other words, it is my view that current Fourth Amendment jurisprudence interposes a warrant requirement not only in cases of third-party electronic monitoring (the situation in *On Lee* and in this case) but also in cases of electronic recording by a government agent of a face-to-face conversation with a criminal suspect, which was the situation in *Lopez.* For I adhere to the dissent in *Lopez,* 373 U. S., at 446–471, in which, to quote my Brother HARLAN, *post,* at 778 n. 12, "the doctrinal basis of our subsequent Fourteenth Amendment decisions may be said to have had its genesis." *Katz* v. *United States,* 389 U. S. 347 (1967), adopted that "doctrinal basis" and thus, it seems to me, agreed with the argument in the *Lopez* dissent that "subsequent decisions and subsequent experience have sapped whatever vitality [*On Lee*] may once have had; that it should now be regarded as over-ruled" and that the situation in *Lopez* "is rationally indistinguishable." 373 U. S., at 447. The reasons in support of those conclusions are set forth fully in the *Lopez*

dissent and need not be repeated here. It suffices to say that for those reasons I remain of the view that the Fourth Amendment imposes the warrant requirement in both the *On Lee* and *Lopez* situations.

Mr. Justice Douglas, dissenting.

I

The issue in this case is clouded and concealed by the very discussion of it in legalistic terms. What the ancients knew as "eavesdropping," we now call "electronic surveillance"; but to equate the two is to treat man's first gunpowder on the same level as the nuclear bomb. Electronic surveillance is the greatest leveler of human privacy ever known. How most forms of it can be held "reasonable" within the meaning of the Fourth Amendment is a mystery. To be sure, the Constitution and Bill of Rights are not to be read as covering only the technology known in the 18th century. Otherwise its concept of "commerce" would be hopeless when it comes to the management of modern affairs. At the same time the concepts of privacy which the Founders enshrined in the Fourth Amendment vanish completely when we slavishly allow an all-powerful government, proclaiming law and order, efficiency, and other benign purposes, to penetrate all the walls and doors which men need to shield them from the pressures of a turbulent life around them and give them the health and strength to carry on.

That is why a "strict construction" of the Fourth Amendment is necessary if every man's liberty and privacy are to be constitutionally honored.

When Franklin D. Roosevelt on May 21, 1940, authorized wiretapping in cases of "fifth column" activities and sabotage and limited it "insofar as possible to aliens," he said that "under ordinary and normal circumstances

wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights." See Appendix I to this dissent. Yet as Judge Ferguson said in *United States* v. *Smith,* 321 F. Supp. 424, 429:

> "[T]he government seems to approach these dissident domestic organizations in the same fashion as it deals with unfriendly foreign powers. The government cannot act in this manner when only domestic political organizations are involved, even if those organizations espouse views which are inconsistent with our present form of government. To do so is to ride roughshod over numerous political freedoms which have long received constitutional protection. The government can, of course, investigate and prosecute criminal violations whenever these organizations, or rather their individual members, step over the line of political theory and general advocacy and commit illegal acts."

Today no one perhaps notices because only a small, obscure criminal is the victim. But every person is the victim, for the technology we exalt today is everyman's master. Any doubters should read Arthur R. Miller's The Assault On Privacy (1971). After describing the monitoring of conversations and their storage in data banks, Professor Miller goes on to describe "human monitoring" which he calls the "ultimate step in mechanical snooping"—a device for spotting unorthodox or aberrational behavior across a wide spectrum. "Given the advancing state of both the remote sensing art and the capacity of computers to handle an uninterrupted and synoptic data flow, there seem to be no physical barriers left to shield us from intrusion." *Id.,* at 46.

When one reads what is going on in this area today, our judicial treatment of the subject seems as remote from

reality as the well-known Baron Parke was remote from the social problems of his day. See Chapman, "Big Brother" in the Justice Department, The Progressive, April 1971, p. 27.

## II

We held in *Berger* v. *New York,* 388 U. S. 41, that wiretapping is a search and seizure within the meaning of the Fourth Amendment and therefore must meet its requirements, *viz.,* there must be a prior showing of probable cause, the warrant authorizing the wiretap must particularly describe "the place to be searched, and the persons or things to be seized," and that it may not have the breadth, generality, and long life of the general warrant against which the Fourth Amendment was aimed.

In *Katz* v. *United States,* 389 U. S. 347, we held that an electronic device, used without trespass onto any given enclosure (there a telephone booth), was a search for which a Fourth Amendment warrant was needed.[1] MR. JUSTICE STEWART, speaking for the Court, said: "Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Id.,* at 359.

As a result of *Berger* and of *Katz,* both wiretapping and electronic surveillance through a "bug" or other device are now covered by the Fourth Amendment.

There were prior decisions representing an opposed view. In *On Lee* v. *United States,* 343 U. S. 747, an

---

[1] See Greenawalt, The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring With the Consent of a Participant in a Conversation, 68 Col. L. Rev. 189; Kitch, Katz v. United States: The Limits of the Fourth Amendment, 1968 Sup. Ct. Rev. 133; Note, Police Undercover Agents: New Threat to First Amendment Freedoms, 37 Geo. Wash. L. Rev. 634; Comment, Electronic Surveillance: The New Standards, 35 Brooklyn L. Rev. 49.

The relaxing of constitutional requirements by the Executive Branch is apparent from the Appendices to this dissent.

undercover agent with a radio transmitter concealed on his person interviewed the defendant whose words were heard over a radio receiver by another agent down the street. The idea, discredited by *Katz,* that there was no violation of the Fourth Amendment because there was no trespass, was the core of the *On Lee* decision. *Id.,* at 751–754.

*Lopez* v. *United States,* 373 U. S. 427, was also pre-*Berger* and pre-*Katz.* The government agent there involved carried a pocket wire recorder which the Court said "was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment." *Id.,* at 439.

MR. JUSTICE BRENNAN, dissenting, stated the philosophy of *Katz* soon to be adopted:

"[T]here is a qualitative difference between electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and disguise. The latter do not so seriously intrude upon the right of privacy. The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak. But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy. . . .

". . . Electronic aids add a wholly new dimension to eavesdropping. They make it more penetrating, more indiscriminate, more truly obnoxious to a free

society. Electronic surveillance, in fact, makes the police omniscient; and police omniscience is one of the most effective tools of tyranny." 373 U. S., at 465–466.

It is urged by the Department of Justice that *On Lee* be established as the controlling decision in this field. I would stand by *Berger* and *Katz* and reaffirm the need for judicial supervision[2] under the Fourth Amendment of the use of electronic surveillance which, uncontrolled, promises to lead us into a police state.

These were wholly pre-arranged episodes of surveillance. The first was in the informant's home to which respondent had been invited. The second was also in the informer's home, the next day. The third was four days later at the home of the respondent. The fourth was in the informer's car two days later. Twelve days after that a meeting in the informer's home was intruded upon. The sixth occurred at a street rendezvous. The seventh was in the informer's home and the eighth in a restaurant owned by respondent's mother-in-law. So far as time is concerned there is no excuse for not seeking a warrant. And while there is always an effort involved in preparing affidavits or other evidence in support of a showing of probable cause, that burden was given constitutional sanction in the Fourth Amendment against the activities of the agents of George III. It was designed not to protect criminals but to protect everyone's privacy.

*On Lee* and *Lopez* are of a vintage opposed to *Berger* and *Katz.* However they may be explained, they are

---

[2] *Osborn* v. *United States,* 385 U. S. 323, was held to be in that tradition, as the federal district judges, prior to the use of the recording device by the agent and with full knowledge of the alleged law violation involved, "authorized the use of a recording device for the narrow and particularized purpose of ascertaining the truth" of the charge. *Id.,* at 330.

products of the old common-law notions of trespass. *Katz,* on the other hand, emphasized that with few exceptions "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment . . . ." 389 U. S., at 357. *Camara* v. *Municipal Court,* 387 U. S. 523, put administrative searches under the Fourth Amendment. We held that administrative actions, like other searches, implicated officials in an invasion of privacy and that the Fourth Amendment was meant to guard against the arbitrariness of any such invasion. We said:

> "We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty." *Id.,* at 533.

In *Chimel* v. *California,* 395 U. S. 752, in considering the constitutionality of a search incident to an arrest we held that, while the area in the immediate reach of an arrestee is "reasonable" though made without a warrant, a search beyond that zone may generally be made "only under the authority of a search warrant." *Id.,* at 763. And in two "stop and frisk" cases, *Terry* v. *Ohio,* 392 U. S. 1, and *Davis* v. *Mississippi,* 394 U. S. 721, we held that any restraint of the person, however brief, was subject to judicial inquiry on "reasonableness" (392 U. S., at 19) and that "the Fourth Amendment governs all intrusions by agents of the public upon personal security . . . ." *Id.,* at 18 n. 15.

We have moved far away from the rationale of *On Lee* and *Lopez* and only a retrogressive step of large dimensions would bring us back to it.

The threads of thought running through our recent decisions are that these extensive intrusions into privacy

made by electronic surveillance make self-restraint by law enforcement officials an inadequate protection, that the requirement of warrants under the Fourth Amendment is essential to a free society.[3]

Monitoring, if prevalent, certainly kills free discourse and spontaneous utterances. Free discourse—a First Amendment value—may be frivolous or serious, humble or defiant, reactionary or revolutionary, profane or in good taste; but it is not free if there is surveillance.[4]

---

[3] The tyranny of surveillance that is not supervised in the Fourth Amendment manner is told by Judge Gesell in *United States* v. *Jones,* 292 F. Supp. 1001, 1008–1009, where the competition between agencies and the uncontrolled activities of subordinates ended up with Government itself playing an ignoble role.

Cf. American Bar Association, Project on Standards for Criminal Justice, Electronic Surveillance §§ 4.1, 5.2 (Approved Draft 1971).

[4] Congressman Mikva of Illinois, in speaking of the spread of military surveillance of civilians—another facet of the problem in the instant case—recently said:

"At one pont they referred to 'infiltrating public meetings' at which Senator Stevenson and I spoke, and I wondered how you 'infiltrate' a public meeting. Perhaps they wanted to compile evidence to be used in some future military court—evidence that I was disloyal to the military establishment because I suggested that we cut manpower by ten per cent last year, or because I voted against their appropriations in the two years I've been here.

.          .          .          .          .

"When they start investigating political figures, there is no place you can draw the line and maintain any kind of civilian control. . . .

.          .          .          .          .

"We have become a fearful people. There was a time when we feared only our enemies abroad. Now we seem to be as fearful of our enemies at home, and depending on whom you talk to, those enemies can include people under thirty, people with foreign names, people of different races, people in the big cities. We have become a suspicious nation, as afraid of being destroyed from within as from without.

"Unfortunately, the manifestations of that kind of fear and suspicion are police-state measures." A Nation in Fear, The Progressive, Feb. 1971, pp. 18, 19–20.

Free discourse liberates the spirit, though it may produce only froth. The individual must keep some facts concerning his thoughts within a small zone of people. At the same time he must be free to pour out his woes or inspirations or dreams to others. He remains the sole judge as to what must be said and what must remain unspoken. This is the essence of the idea of privacy implicit in the First and Fifth Amendments as well as in the Fourth.

The philosophy of the value of privacy reflected in the Fourth Amendment's ban on "unreasonable searches and seizures" has been forcefully stated by a former Attorney General of the United States:

> "Privacy is the basis of individuality. To be alone and be let alone, to be with chosen company, to say what you think, or don't think, but to say what you will, is to be yourself. Solitude is imperative, even in a high rise apartment. Personality develops from within. To reflect is to know yourself. Character is formed through years of self-examination. Without this opportunity, character will be formed largely by uncontrolled external social stimulations. Americans are excessively homogenized already.

> "Few conversations would be what they are if the speakers thought others were listening. Silly, secret, thoughtless and thoughtful statements would all be affected. The sheer numbers in our lives, the anonymity of urban living and the inability to influence things that are important are depersonalizing and dehumanizing factors of modern life. To penetrate the last refuge of the individual, the precious little privacy that remains, the basis of individual dignity, can have meaning to the quality of our lives that we cannot foresee. In terms of present values, that meaning cannot be good.

"Invasions of privacy demean the individual. Can a society be better than the people composing it? When a government degrades its citizens, or permits them to degrade each other, however beneficent the specific purpose, it limits opportunities for individual fulfillment and national accomplishment. If America permits fear and its failure to make basic social reforms to excuse police use of secret electronic surveillance, the price will be dear indeed. The practice is incompatible with a free society." R. Clark, Crime in America 287 (1970).

Now that the discredited decisions in *On Lee* and *Lopez* are resuscitated and revived, must everyone live in fear that every word he speaks may be transmitted or recorded [5] and later repeated to the entire world? I can

---

[5] Senator Edward Long, who intensively investigated wiretapping and "bugging" said:

"You would be amazed at the different ways you can now be 'bugged.' There is today a transmitter the size of an aspirin tablet which can help transmit conversations in your room to a listening post up to 10 miles away.

"An expert can devise a bug to fit into almost any piece of furniture in your room. And even if you find the bug, you will have no evidence of who put it there. A United States Senator was bugged by a transmitter secretly placed into a lamp which his wife was having fixed at the shop. When experts searched for the transmitter, it was gone.

"A leading electronics expert told my Subcommittee last year that wiretapping and bugging in industrial espionage triples every year. He said that new bugging devices are so small and cleverly concealed that it takes search equipment costing over one hundred thousand dollars and an expert with 10 years of field experience to discover them. Ten years ago, the same search for bugs could have been done with equipment costing only one-fourth as much.

"In California we found a businessman who had been so frightened by electronic eavesdropping devices which had been concealed in his

imagine nothing that has a more chilling effect on people speaking their minds and expressing their views on important matters. The advocates of that regime should spend some time in totalitarian countries and learn firsthand the kind of regime they are creating here.[6]

office, that he is now spending thousands of dollars having his office searched each day, taking his phone apart every morning, and stationing a special guard outside his office 24 hours a day.

"He is one of a growing number of men in industry who live in constant fear that what they say is being listened to by their competitor." 19 Adm. L. Rev. 442, 444. And see E. Long, The Intruders (1966).

[6] "A technological breakthrough in techniques of physical surveillance now makes it possible for government agents and private persons to penetrate the privacy of homes, offices, and vehicles; to survey individuals moving about in public places; and to monitor the basic channels of communication by telephone, telegraph, radio, television, and data line. Most of the 'hardware' for this physical surveillance is cheap, readily available to the general public, relatively easy to install, and not presently illegal to own. As of the 1960's, the new surveillance technology is being used widely by government agencies of all types and at every level of government, as well as by private agents for a rapidly growing number of businesses, unions, private organizations, and individuals in every section of the United States. Increasingly, permanent surveillance devices have been installed in facilities used by employees or the public. While there are defenses against 'outside' surveillance, these are so costly and complex and demand such constant vigilance that their use is feasible only where official or private matters of the highest security are to be protected. Finally, the scientific prospects for the next decade indicate a continuing increase in the range and versatility of the listening and watching devices, as well as the possibility of computer processing of recordings to identify automatically the speakers or topics under surveillance. These advances will come just at the time when personal contacts, business affairs, and government operations are being channeled more and more into electronic systems such as data-phone lines and computer communications." A. Westin, Privacy and Freedom 365–366 (1967).

## III

The decision not to make *Katz* retroactive to any electronic surveillance which occurred prior to December 18, 1967 (the day we decided *Katz*), is not, in my view, a tenable one for the reasons stated by MR. JUSTICE HARLAN and me in our dissents in *Desist* v. *United States*, 394 U. S. 244, 255, 256.

## APPENDIX I TO OPINION OF DOUGLAS, J., DISSENTING

### THE WHITE HOUSE
### WASHINGTON

May 21, 1940

CONFIDENTIAL

### MEMORANDUM FOR THE
### ATTORNEY GENERAL

I have agreed with the broad purpose of the Supreme Court decision relating to wire-tapping in investigations. The Court is undoubtedly sound both in regard to the use of evidence secured over tapped wires in the prosecution of citizens in criminal cases; and is also right in its opinion that under ordinary and normal circumstances wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights.

However, I am convinced that the Supreme Court never intended any dictum in the particular case which it decided to apply to grave matters involving the defense of the nation.

It is, of course, well known that certain other nations have been engaged in the organization of propaganda of so-called "fifth columns" in other countries and in preparation for sabotage, as well as in actual sabotage.

It is too late to do anything about it after sabotage, assassinations and "fifth column" activities are completed.

You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens.

[SEAL] /s/ F. D. R.

## APPENDIX II TO OPINION OF DOUGLAS, J., DISSENTING

ADMINISTRATIVELY CONFIDENTIAL
THE WHITE HOUSE
WASHINGTON

June 30, 1965

MEMORANDUM FOR THE HEADS OF
EXECUTIVE DEPARTMENTS
AND AGENCIES

I am strongly opposed to the interception of telephone conversations as a general investigative technique. I recognize that mechanical and electronic devices may sometimes be essential in protecting our national security. Nevertheless, it is clear that indiscriminate use of those investigative devices to overhear telephone conversations, without the knowledge or consent of any of the persons involved, could result in serious abuses and invasions of privacy. In my view, the invasion of privacy of communications is a highly offensive practice which should be engaged in only where the national security is at

stake. To avoid any misunderstanding on this subject in the Federal Government, I am establishing the following basic guidelines to be followed by all government agencies:

(1) No federal personnel is to intercept telephone conversations within the United States by any mechanical or electronic device, without the consent of one of the parties involved, (except in connection with investigations related to the national security).

(2) No interception shall be undertaken or continued without first obtaining the approval of the Attorney General.

(3) All federal agencies shall immediately conform their practices and procedures to the provisions of this order.

Utilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem, which raises substantial and unresolved questions of Constitutional interpretation. I desire that each agency conducting such investigations consult with the Attorney General to ascertain whether the agency's practices are fully in accord with the law and with a decent regard for the rights of others.

Every agency head shall submit to the Attorney General within 30 days a complete inventory of all mechanical and electronic equipment and devices used for or capable of intercepting telephone conversations. In addition, such reports shall contain a list of any interceptions currently authorized and the reasons for them.

/s/ Lyndon B. Johnson

MR. JUSTICE HARLAN, dissenting.

The uncontested facts of this case squarely challenge the continuing viability of *On Lee* v. *United States,* 343 U. S. 747 (1952). As the plurality opinion of MR. JUS-

TICE WHITE itself makes clear, important constitutional developments since *On Lee* mandate that we reassess that case, which has continued to govern official behavior of this sort in spite of the subsequent erosion of its doctrinal foundations. With all respect, my agreement with the plurality opinion ends at that point.

I think that a perception of the scope and role of the Fourth Amendment, as elucidated by this Court since *On Lee* was decided, and full comprehension of the precise issue at stake lead to the conclusion that *On Lee* can no longer be regarded as sound law. Nor do I think the date we decided *Katz* v. *United States,* 389 U. S. 347 (1967), can be deemed controlling both for the reasons discussed in my dissent in *Desist* v. *United States,* 394 U. S. 244, 256 (1969), and my separate opinion in *Mackey* v. *United States* (and companion cases), *ante,* p. 675 (the case before us being here on *direct* review), and because, in my view, it requires no discussion of the holding in *Katz,* as distinguished from its underlying rationale as to the reach of the Fourth Amendment, to comprehend the constitutional infirmity of *On Lee.*

## I

Before turning to matters of precedent and policy, several preliminary observations should be made. We deal here with the constitutional validity of instantaneous third-party electronic eavesdropping, conducted by federal law enforcement officers, without any prior judicial approval of the technique utilized, but with the consent and cooperation of a participant in the conversation,[1]

---

[1] I agree with the plurality opinion, *ante,* at 747 n. 1, that the issue of the informer's consent to utilization of this technique is not properly before us. Whether persons can, consistent with constitutional prohibitions, be tricked or coerced into transmitting their conversations, with or without prior judicial approval, and, if not, whether

and where the substance of the matter electronically overheard [2] is related in a federal criminal trial by those who eavesdropped as direct, not merely corroborative, evidence of the guilt of the nonconsenting party. The magnitude of the issue at hand is evidenced not simply by the obvious doctrinal difficulty of weighing such activity in the Fourth Amendment balance, but also, and more importantly, by the prevalence of police utilization of this technique. Professor Westin has documented in careful detail the numerous devices that make technologically feasible the Orwellian Big Brother. Of immediate relevance is his observation that " 'participant recording,' in which one participant in a conversation or meeting, either a police officer or a co-operating party, wears a concealed device that records the conversation or broadcasts it to others nearby . . . is used tens of thousands of times each year throughout the country, particularly in cases involving extortion, conspiracy, narcotics, gambling, prostitution, corruption by police officials . . . and similar crimes." [3]

---

other parties to the conversation would have standing to object to the admission against them of evidence so obtained, cf. *Alderman* v. *United States,* 394 U. S. 165 (1969), are questions upon which I express no opinion.

[2] In the case at hand agents were also surreptitiously placed in respondent's home at various times. No testimony by these agents was offered at trial.

[3] A. Westin, Privacy and Freedom 131 (1967). This investigative technique is also used to unearth "political" crimes. "Recordings of the private and public meetings of suspect groups [have] been growing. Police in Miami, Florida, used a hidden transmitter on a police agent to record statements made at meetings of a right-wing extremist group suspected of planning acts of terrorism. In 1964 a police undercover agent obtained recordings of incendiary statements by the leader of a Communist splinter movement in Harlem, at private meetings and at a public rally, which served as the basis for his conviction for attempting to overthrow the state government." *Ibid.*

Moreover, as I shall undertake to show later in this opinion, the factors that must be reckoned with in reaching constitutional conclusions respecting the use of electronic eavesdropping as a tool of law enforcement are exceedingly subtle and complex. They have provoked sharp differences of opinion both within and without the judiciary, and the entire problem has been the subject of continuing study by various governmental and nongovernmental bodies.[4]

---

[4] Prior to *Osborn* v. *United States*, 385 U. S. 323 (1966), and *Katz* the issue before us, if raised, was usually dismissed in a routine fashion with a citation to *On Lee*, buttressed by a citation to *Lopez* v. *United States*, 373 U. S. 427 (1963), with no attempt to distinguish the two cases despite the narrow rationale of the latter. See, *e. g.*, *United States* v. *Pasquinzo*, 334 F. 2d 74, 75 (CA6 1964); *Maddox* v. *United States*, 337 F. 2d 234 (CA5 1964); but cf. *United States* v. *Stone*, 232 F. Supp. 396 (ND Tex. 1964). The few authorities post-dating *Katz* have divided on the continued viability of the *On Lee* result, compare, *e. g.*, *United States* v. *Jones*, 292 F. Supp. 1001 (DC 1968), and cases cited therein, 292 F. Supp., at 1008, with *Dancy* v. *United States*, 390 F. 2d 370 (CA5 1968) (Judge Fahy dissenting); *United States* v. *Kaufer*, 406 F. 2d 550 (CA2 1969); *People* v. *Fiedler*, 30 App. Div. 2d 476, 294 N. Y. S. 2d 368 (1968) (Justices Goldman and Bastow dissenting), aff'd without opinion, 24 N. Y. 2d 960, 250 N. E. 2d 75 (1969). Perhaps the most comprehensive treatments, examining both the case law and policy considerations underlying the precise issue—electronic surveillance with the consent of one of the parties—are by Professor Greenawalt, The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring With the Consent of a Participant in a Conversation, 68 Col. L. Rev. 189 (1968), and Professor Kitch, Katz v. United States: The Limits of the Fourth Amendment, 1968 Sup. Ct. Rev. 133. For an interesting analysis of the impact of nonconsensual bugging on privacy and the role of prior judicial authorization see Spritzer, Electronic Surveillance By Leave of the Magistrate: The Case in Opposition, 118 U. Pa. L. Rev. 169 (1969). In addition, see American Bar Association, Project on Standards for Criminal Justice, Electronic Surveillance § 4.1 (Approved Draft 1971); J. Landynski, Search and Seizure and the Supreme Court

Finally, given the importance of electronic eavesdropping as a technique for coping with the more deep-seated kinds of criminal activity, and the complexities that are encountered in striking a workable constitutional balance between the public and private interests at stake, I believe that the courts should proceed with specially measured steps in this field. More particularly, I think this Court should not foreclose itself from reconsidering doctrines that would prevent the States from seeking, independently of the niceties of federal restrictions as they may develop, solutions to such vexing problems, see *Mapp* v. *Ohio,* 367 U. S. 643 (1961), and *Ker* v. *California,* 374 U. S. 23 (1963), and see also *Berger* v. *New York,* 388 U. S. 41 (1967); *Baldwin* v. *New York,* 399 U. S. 66, 117 (1970) (dissenting opinion); *California* v. *Green,* 399 U. S. 149, 172 (1970) (concurring opinion). I also think that in the adjudication of federal cases, the Court should leave ample room for congressional developments.

198–244 (1966); Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order," 67 Mich. L. Rev. 455, 495–496 (1969); S. Dash, R. Schwartz, & R. Knowlton, The Eavesdroppers 421–441 (1959); Comment, Eavesdropping, Informers, and the Right of Privacy: A Judicial Tightrope, 52 Cornell L. Q. 975 (1967); King, Electronic Surveillance and Constitutional Rights: Some Recent Developments and Observations, 33 Geo. Wash. L. Rev. 240 (1964); Note, Wiretapping and Electronic Surveillance— Title III of the Crime Control Act of 1968, 23 Rutgers L. Rev. 319 (1969); Blakey & Hancock, A Proposed Electronic Surveillance Control Act, 43 Notre Dame Law. 657 (1968); Kamisar, The Wiretapping-Eavesdropping Problem: A Professor's View, 44 Minn. L. Rev. 891 (1960); Note, From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection, 43 N. Y. U. L. Rev. 968, 973–974 (1968); Scoular, Wiretapping and Eavesdropping Constitutional Development from Olmstead to Katz, 12 St. Louis L. J. 513 (1968); 20 Syracuse L. Rev. 791 (1969); 14 Vill. L. Rev. 758 (1969).

## II

On these premises I move to the problem of third-party "bugging." To begin by tracing carefully the evolution of Fourth Amendment doctrine in post-*On Lee* decisions has proved useful in several respects. It serves to cast in perspective both the issue involved here and the imperative necessity for reconsidering *On Lee* afresh. Additionally, a full exposition of the dynamics of the decline of the trespass rationale underlying *On Lee* strikingly illuminates the deficiencies of the plurality opinion's retroactivity analysis.

### A

*On Lee* involved circumstances virtually identical to those now before us. There, Government agents enlisted the services of Chin Poy, a former friend of Lee, who was suspected of engaging in illegal narcotics traffic. Poy was equipped with a "minifon" transmitting device which enabled outside Government agents to monitor Poy's conversations with Lee. In the privacy of his laundry, Lee made damaging admissions to Poy which were overheard by the agents and later related at trial. Poy did not testify. Mr. Justice Jackson, writing for five Justices, held the testimony admissible. Without reaching the question of whether a conversation could be the subject of a "seizure" for Fourth Amendment purposes, as yet an unanswered if not completely open question,[5] the

---

[5] See *Goldman* v. *United States,* 316 U. S. 129 (1942). *Silverman* v. *United States,* 365 U. S. 505 (1961), made explicit that which was still unclear after *Goldman:* words overheard by trespass are subject to Fourth Amendment protection. See also *Wong Sun* v. *United States,* 371 U. S. 471 (1963).

Court concluded that in the absence of a trespass,[6] no constitutional violation had occurred.[7]

The validity of the trespass rationale was questionable even at the time the decision was rendered. In this respect *On Lee* rested on common-law notions and looked to a waning era of Fourth Amendment jurisprudence. Three members of the Court refused to join with Justice Jackson, and within 10 years the Court expressly disavowed an approach to Fourth Amendment questions that looked to common-law distinctions. See, *e. g.*, *Jones* v. *United States*, 362 U. S. 257 (1960); *Silverman* v. *United States*, 365 U. S. 505 (1961); *Lanza* v. *New York*, 370 U. S. 139 (1962).

It is, of course, true that the opinion in *On Lee* drew some support from a brief additional assertion that "eavesdropping on a conversation, with the connivance of one of the parties" raises no Fourth Amendment problem. 343 U. S., at 754. But surely it is a misreading of that opinion to view this unelaborated assertion as a wholly independent ground for decision. At the very least, this

---

[6] Mr. Justice Jackson rejected petitioner's contention that Poy's deception vitiated Lee's consent to his entry on the premises. 343 U. S., at 752.

[7] 343 U. S., at 751–752:

"The conduct of Chin Poy and agent Lee did not amount to an unlawful search and seizure such as is proscribed by the Fourth Amendment. In *Goldman* v. *United States*, 316 U. S. 129 . . . , the agents had earlier committed a trespass in order to install a listening device within the room itself. Since the device failed to work, the Court expressly reserved decision as to the effect on the search-and-seizure question of a trespass in that situation. Petitioner in the instant case has seized upon that dictum, apparently on the assumption that the presence of a radio set would automatically bring him within the reservation if he can show a trespass.

"But petitioner cannot raise the undecided question, for here no trespass was committed. Chin Poy entered a place of business with the consent, if not by the implied invitation, of the petitioner."

rationale needs substantial buttressing if it is to persist in our constitutional jurisprudence after the decisions I discuss below. Indeed, the plurality opinion in the present case, in greatly elaborating the point, tacitly recognizes' the analytic inability of this bare hypothesis to support a rule of law so profoundly important to the proper administration of justice. Moreover, if this was the true rationale of *On Lee* from the outset, it is difficult to see the relevance of *Desist* to the resolution of the instant case, for *Katz* surely does not speak directly to the continued viability of that ground for decision. See *Katz* v. *United States,* 389 U. S., at 363 n. (WHITE, J., concurring).

By 1963, when we decided *Lopez* v. *United States,* 373 U. S. 427, four members of the Court were prepared to pronounce *On Lee* and *Olmstead* v. *United States,* 277 U. S. 438 (1928), dead.[8] The pyre, they reasoned, had been stoked by decisions like *Wong Sun* v. *United States,* 371 U. S. 471 (1963), which, on the one hand, expressly brought verbal communication within the sweep of the Fourth Amendment,[9] and, on the other, re-

---

[8] Both Chief Justice Warren, in concurrence, 373 U. S., at 441, and MR. JUSTICE BRENNAN, who wrote a dissenting opinion in which he was joined by JUSTICES DOUGLAS and Goldberg, 373 U. S., at 446, were of the view that *Olmstead* and *On Lee* should be overruled. Cf. *United States* v. *Stone,* 232 F. Supp. 396 (ND Tex. 1964).

[9] While *Silverman* v. *United States,* 365 U. S. 505, would seem to have eliminated any lingering uncertainty on this score, cf. *Goldman* v. *United States,* 316 U. S. 129, *Wong Sun* articulated the unspoken premise of *Silverman.* "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States,* 365 U. S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during

inforced our *Silverman* and *Jones* decisions which "refused to crowd the Fourth Amendment into the mold of local property law," 373 U. S., at 460 (BRENNAN, J., dissenting).

Although the Court's decision in *Lopez* is cited by the Government as a reaffirmation of *On Lee,* it can hardly be thought to have nurtured the questionable rationale of that decision or its much-criticized ancestor, *Olmstead.* To the discerning lawyer *Lopez* could only give pause, not comfort. While the majority opinion, of which I was the author, declined to follow the course favored by the dissenting and concurring Justices by sounding the death knell for *Olmstead* and *On Lee,* our holding, despite an allusion to the absence of "an unlawful . . . invasion of a constitutionally protected area," 373 U. S., at 438–439, was bottomed on two premises: the corroborative use that was made of the tape recordings, which increased reliability in the factfinding process, and the absence of a "risk" not fairly assumed by petitioner. The tape recording was made by a participant in the conversation and the opinion emphasized this absence of a third-party intrusion, expressly noting that there was no "electronic eavesdropping on a private conversation which government agents could not otherwise have overheard." 373 U. S., at 440.[10] As I point out in Part III

---

an unlawful invasion has been excluded in order to enforce the basic constitutional policies. [Citation omitted.] Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." 371 U. S., at 485. While I joined Mr. Justice Clark's dissenting opinion, 371 U. S., at 498, our differences with the majority involved only their analysis of probable cause.

[10] "Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the

of this opinion, it is one thing to subject the average citizen to the risk that participants in a conversation with him will subsequently divulge its contents to another, but quite a different matter to foist upon him the risk that unknown third parties may be simultaneously listening in.

While *Lopez* cited *On Lee* without disavowal of its holding, 373 U. S., at 438, it is entirely accurate to say that we did not there reaffirm it.[11] No decision since *Lopez* gives a breath of life to the reasoning that led to the *On Lee* and *Olmstead* results, and it required little clairvoyance to predict the demise of the basic rationale of *On Lee* and *Olmstead* foreshadowed by our subsequent opinions in *Osborn* v. *United States,* 385 U. S. 323 (1966), and *Berger* v. *New York,* 388 U. S. 41 (1967).

Only three years after *Lopez,* MR. JUSTICE STEWART writing for the Court in *Osborn* v. *United States, supra,* expressly abjured reliance on *Lopez* and, instead, approved identical conduct based on the "circumstances under which the tape recording was obtained in [that] case," facts that involved "using [a recorder] under the most precise and discriminate circumstances, circumstances which fully met the 'requirement of particularity'

---

agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." 373 U. S., at 439.

[11] The Chief Justice and dissenters, concerned with the *possibility* that "the majority opinion *may be* interpreted as reaffirming *sub silentio* the result in *On Lee* v. *United States,*" expressly repudiated it. 373 U. S., at 441 (first emphasis added).

which the dissenting opinion in *Lopez* found necessary."
*Osborn* v. *United States*, 385 U. S., at 327, 329.[12]

Since *Osborn* our decisions have shown no tolerance
for the old dividing lines resting, as they did, on fiction and
common-law distinctions without sound policy justifica-
tion in the realm of values protected by the Fourth
Amendment. Thus, in abolishing the "mere evidence
rule" we announced that "the principal object of the
Fourth Amendment is the protection of privacy rather
than property," and once again noted the trend to dis-
card "fictional and procedural barriers rested on prop-
erty concepts." *Warden* v. *Hayden*, 387 U. S. 294, 304
(1967). That same Term the Court demonstrated the
new flexibility in Fourth Amendment doctrine when it
held that the warrant protections would be applied to
administrative searches. *Camara* v. *Municipal Court*,
387 U. S. 523 (1967).

Certainly if *Osborn, Warden,* and *Camara* did not
plainly draw into question the vigor of earlier precedents,
*Berger* v. *New York*, 388 U. S. 41, did, and expunged any
remnants of former doctrine which might have been

---

[12] In a footnote the Court in *Osborn* outlined a new approach,
foreshadowed by MR. JUSTICE BRENNAN's *Lopez* dissent, in which
the doctrinal basis of our subsequent Fourth Amendment decisions
may be said to have had its genesis:

"The requirements of the Fourth Amendment are not inflexible, or
obtusely unyielding to the legitimate needs of law enforcement.
It is at least clear that 'the procedure of antecedent justification
before a magistrate that is central to the Fourth Amendment,' [cita-
tions omitted] could be made a precondition of lawful electronic
surveillance . . . ." *Osborn* v. *United States*, 385 U. S. 323, 330
n. 9, quoting MR. JUSTICE BRENNAN's dissenting opinion in *Lopez*
v. *United States*, 373 U. S., at 464.

Judge Gesell in reviewing the precedents has recently concluded
that it was *Katz,* read in conjunction with *Osborn,* that buried
*On Lee. United States* v. *Jones,* 292 F. Supp. 1001, 1008 (DC 1968).

thought to have survived *Osborn* and *Warden*.[13] There, the Court, following a path opened by Mr. Justice Brandeis' dissent in *Olmstead,* and smoothed in *Osborn* and *Camara,* expressed concern about scientific developments that have put within the reach of the Government the private communications of "anyone in almost any given situation," 388 U. S., at 47; it left no doubt that, as a general principle, electronic eavesdropping was an invasion of privacy and that the Fourth Amendment prohibited unsupervised "bugging." Disturbed by the extent of intrusion which "[b]y its very nature . . . is broad in scope," and noting that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices," *id.,* at 63, the Court brought to life the principle of reasonableness adumbrated in *Osborn.* Mr. Justice Clark, writing for the majority, reiterated the new approach:

> "[T]he 'indiscriminate use of such [bugging] devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments,' and imposes 'a heavier responsibility on this Court in its supervision of the fairness of procedures . . . .' " 388 U. S., at 56, quoting from *Osborn* v. *United States,* 385 U. S. 323, 329 n. 7.

Nor did the Court waver in resolve in the face of respondent's dire prediction that "neither a warrant nor a statute authorizing eavesdropping can be drawn so as to meet the Fourth Amendment's requirements."[14] It

---

[13] See Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order," 67 Mich. L. Rev. 455, 458–459 (1969).

[14] My principal disagreement with the Court in *Berger* involved the wisdom of reviewing the New York statute on its face rather than focusing on the facts and circumstances of the particular case, and the exposition of the appropriate application of warrant principles to eavesdropping situations. 388 U. S., at 96–106.

was said that "[i]f that be true then the 'fruits' of eaves-dropping devices are barred under the Amendment." 388 U. S., at 63.[15]

If *Berger* did not flatly sound a dirge for *Olmstead,* it articulated principles that led MR. JUSTICE DOUGLAS, by way of concurrence, to comment on its quiet burial. 388 U. S., at 64. While it was left to *Katz* to perform the last rites, that decision inevitably followed from *Osborn* and *Berger.* The *Berger* majority's affirmative citation of *On Lee* for the principle that "under specific conditions and circumstances" eavesdropping may be law-ful, 388 U. S., at 63, serves only to underscore the emerg-ing operative assumptions: that the particular circum-stances of each case will be scrutinized to the end of ascertaining the reasonableness of the search, and that will depend in large measure on whether prior judicial authorization, based on a particularized showing, has been obtained. *Katz* v. *United States, supra.*

Viewed in perspective, then, *Katz* added no new di-mension to the law. At most it was a formal dispatch of *Olmstead* and the notion that such problems may usefully be resolved in the light of trespass doctrine, and, of course, it freed from speculation what was already evi-dent, that *On Lee* was completely open to question.

## B

But the decisions of this Court since *On Lee* do more than demonstrate that the doctrine of that case is wholly open for reconsideration, and has been since well be-fore *Katz* was decided. They also establish sound gen-eral principles for application of the Fourth Amendment that were either dimly perceived or not fully worked out

---

[15] Cf. Spritzer, Electronic Surveillance By Leave of the Magis-trate: The Case in Opposition, 118 U. Pa. L. Rev. 169 (1969).

at the time of *On Lee.* I have already traced some of these principles in Part II-A, *supra:* that verbal communication is protected by the Fourth Amendment, that the reasonableness of a search does not depend on the presence or absence of a trespass, and that the Fourth Amendment is principally concerned with protecting interests of privacy, rather than property rights.

Especially when other recent Fourth Amendment decisions, not otherwise so immediately relevant, are read with those already discussed, the primacy of an additional general principle becomes equally evident: official investigatory action that impinges on privacy must typically, in order to be constitutionally permissible, be subjected to the warrant requirement. Particularly significant in this regard are *Camara* v. *Municipal Court,* 387 U. S. 523 (1967); *Terry* v. *Ohio,* 392 U. S. 1 (1968), and *Chimel* v. *California,* 395 U. S. 752 (1969).

In *Camara* the Court brought under the Fourth Amendment administrative searches that had once been thought to be without its sweep. In doing so the opinion emphasized the desirability of establishing in advance those circumstances that justified the intrusion into a home and submitting them for review to an independent assessor,[16] principles that this Court has always deemed to be at the core of Fourth Amendment protections.[17]

---

[16] See *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964), where the Court emphasized the importance of "an objective predetermination" uncomplicated by a presentation not "subtly influenced by the familiar shortcomings of hindsight judgment."

[17] The classic exposition of the purposes and importance of the warrant requirement is to be found in the opinion of Mr. Justice Jackson in his opinion for the Court in *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948):

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn

In bringing such searches within the ambit of the warrant requirement, *Camara* rejected the notion that the "less hostile" nature of the search relegated this invasion of privacy to the "periphery" of Fourth Amendment concerns.  387 U. S., at 530.  The central consideration was, the Court concluded, that these administrative actions, no less than the typical search, involved government officials in an invasion of privacy, and that it was against the possible arbitrariness of invasion that the Fourth Amendment with its warrant machinery was meant to guard. *Berger* and *Katz* built, as noted earlier, on *Osborn* v. *United States, supra,* and *Camara,* and gave further expression to the principle.[18]  It was not enough that government agents acted with restraint, for reasonableness must in the first instance be judged in a detached realm.[19]

by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . .  The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

See also *Terry* v. *Ohio,* 392 U. S. 1 (1968); *United States* v. *Ventresca,* 380 U. S. 102 (1965); *Aguilar* v. *Texas,* 378 U. S. 108 (1964); *Wong Sun* v. *United States,* 371 U. S. 471 (1963); *Chapman* v. *United States,* 365 U. S. 610 (1961); *Jones* v. *United States,* 362 U. S. 257 (1960); *Jones* v. *United States,* 357 U. S. 493 (1958); *Giordenello* v. *United States,* 357 U. S. 480 (1958); *United States* v. *Jeffers,* 342 U. S. 48 (1951); *McDonald* v. *United States,* 335 U. S. 451 (1948); *Trupiano* v. *United States* 334 U. S. 699 (1948); *United States* v. *Lefkowitz,* 285 U. S. 452 (1932); *Agnello* v. *United States,* 269 U. S. 20 (1925).

[18] See Part II-A, *supra.*  See *United States* v. *Jones,* 292 F. Supp. 1001 (DC 1968).

[19] " 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' *United States* v. *Jeffers,* 342 U. S. 48, 51, and that

The scope and meaning of the rule have emerged with even greater clarity by virtue of our holdings setting the boundaries for the exceptions. Recently, in *Chimel* v. *California,* 395 U. S. 752 (1969), we reiterated the importance of the prior independent determination of a neutral magistrate and underscored its centrality to the reasonableness requirement of the Fourth Amendment, and abandoned the holdings of *Harris* v. *United States,* 331 U. S. 145 (1947), and *United States* v. *Rabinowitz,* 339 U. S. 56 (1950). We were concerned by the breadth of searches occasioned by the *Rabinowitz* rule which frequently proved to be an invitation to a hunting expedition. Searches incident to arrest, we held, must be confined to a locus no greater than necessary to prevent injury to the arresting officer or destruction of evidence. 395 U. S., at 763, 767; cf. *Terry* v. *Ohio,* 392 U. S. 1 (1968).

To complete the tapestry, the strands of doctrine reflected in the search cases must be interwoven with the Court's other contemporary holdings. Most signifi-

---

searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States,* 389 U. S., at 356–357.

The warrant procedure need not always entail an inquiry into the existence of probable cause in the usual sense. Cf. *Camara* v. *Municipal Court.* For example, where an informer is being sent in to investigate a dangerous crime, and there is reason to believe his person would be in danger, monitoring might be justified and a warrant issued even though no probable cause existed to believe the particular meeting would provide evidence of particular criminal activity. Cf. *Warden* v. *Hayden,* 387 U. S. 294, 298 (1967); *McDonald* v. *United States,* 335 U. S., at 455–456; *Johnson* v. *United States,* 333 U. S., at 14–15; *Ker* v. *California,* 374 U. S. 23 (1963); *Trupiano* v. *United States,* 334 U. S. 699 (1948), all taking the view that exceptions to the warrant requirement may be made in narrowly defined special circumstances.

cant are *Terry* v. *Ohio, supra,* and *Davis* v. *Mississippi,* 394 U. S. 721 (1969), which were also harbingers of the new thrust in Fourth Amendment doctrine. There the Court rejected the contention that only an arrest triggered the "incident-to-arrest" exception to the warrant requirement of the Fourth Amendment, and held that any restraint of the person, however brief and however labeled, was subject to a reasonableness examination. 392 U. S., at 19. The controlling principle is "to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness." 392 U. S., at 18 n. 15. See also *Davis* v. *Mississippi,* 394 U. S., at 727.[20]

## III

### A

That the foundations of *On Lee* have been destroyed does not, of course, mean that its result can no longer stand. Indeed, the plurality opinion today fastens upon our decisions in *Lopez, Lewis* v. *United States,* 385 U. S. 206 (1966), and *Hoffa* v. *United States,* 385 U. S. 293 (1966), to resist the undercurrents of more recent cases emphasizing the warrant procedure as a safeguard to privacy. But this category provides insufficient support. In each of these cases the risk the general populace faced was different from that surfaced by the instant case. No surreptitious third ear was present, and in each opinion that fact was carefully noted.

---

[20] I do not consider *Chambers* v. *Maroney,* 399 U. S. 42 (1970), a retreat from the general proposition established by *Katz* and *Chimel.* While I disagreed with the Court, see my separate opinion, 399 U. S., at 55, moving vehicles have always presented a special Fourth Amendment problem. Compare *Carroll* v. *United States,* 267 U. S. 132 (1925), with *Agnello* v. *United States,* 269 U. S. 20 (1925).

In *Lewis,* a federal agent posing as a potential pur-
chaser of narcotics gained access to petitioner's home
and there consummated an illegal sale, the fruits of which
were admitted at trial along with the testimony of the
agent. Chief Justice Warren, writing for the majority,
expressly distinguished the third-party overhearing in-
volved, by way of example, in a case like *Silverman* v.
*United States, supra,* noting that "there, the conduct pro-
scribed was that of eavesdroppers, unknown and un-
wanted intruders who furtively listened to conversations
occurring in the privacy of a house." 385 U. S., at 212.
Similarly in *Hoffa,* MR. JUSTICE STEWART took care to
mention that "surreptitious" monitoring was not there
before the Court, and so too in *Lopez, supra.*

The plurality opinion seeks to erase the crucial distinc-
tion between the facts before us and these holdings by the
following reasoning: if A can relay verbally what is re-
vealed to him by B (as in *Lewis* and *Hoffa*), or record and
later divulge it (as in *Lopez*), what difference does it
make if A conspires with another to betray B by con-
temporaneously transmitting to the other all that is
said? The contention is, in essence, an argument that
the distinction between third-party monitoring and *other*
undercover techniques is one of form and not substance.
The force of the contention depends on the evaluation of
two separable but intertwined assumptions: first, that
there is no greater invasion of privacy in the third-party
situation, and, second, that uncontrolled consensual
surveillance in an electronic age is a tolerable technique
of law enforcement, given the values and goals of our
political system.[21]

---

[21] Professor Westin has observed:

"It is obvious that the political system in each society will be
a fundamental force in shaping its balance of privacy, since certain
patterns of privacy, disclosure, and surveillance are functional neces-

The first of these assumptions takes as a point of departure the so-called "risk analysis" approach of *Lewis,* and *Lopez,* and to a lesser extent *On Lee,* or the expectations approach of *Katz.* See discussion in Part II, *supra.* While these formulations represent an advance over the unsophisticated trespass analysis of the common law, they too have their limitations and can, ultimately, lead to the substitution of words for analysis.[22] The analysis must, in my view, transcend the search for subjective expectations or legal attribution of assumptions of risk. Our expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present.

Since it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society. The critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement.

This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement. For those more extensive intrusions that significantly jeopardize the sense of security which is the paramount concern of Fourth Amendment liberties, I am of the view that more than self-restraint by law enforcement officials is required and at the least warrants

---

sities for particular kinds of political regime. This is shown most vividly by contrasting privacy in the democratic and the totalitarian state." Westin, *supra,* n. 3, at 23.

[22] See Kitch, *supra,* n. 4, at 141–142, 150–152.

should be necessary. Cf. *Terry* v. *Ohio, supra; Davis* v. *Mississippi, supra.*

## B

The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation upheld in *Lewis* and *Hoffa.* The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattle-tale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.

Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life.[23] Much off-hand exchange is easily for-

---

[23] Greenawalt, *supra,* n. 4; Comment, Eavesdropping, Informers, and the Right of Privacy: A Judicial Tightrope, 52 Cornell L. Q. 975, 983 (1967); Westin, *supra,* n. 3, at 390.

Professor Westin, in projecting the consequences of unsupervised participant monitoring, has observed:

"[E]avesdropping with the consent of one party . . . has been the basic charter for private-detective taps and bugs, for 'owner' eavesdropping on facilities that are used by members of the public, and for much free-lance police eavesdropping. Allowing eavesdropping with the consent of one party would destroy the statutory

gotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record.[24]   All these values are sacrificed by

plan of limiting the offenses for which eavesdropping by device can be used and insisting on a court-order process.  And as technology enables every man to carry his micro-miniaturized recorder everywhere he goes and allows every room to be monitored surreptitiously by built-in equipment, permitting eavesdropping with the consent of one party would be to sanction a means of reproducing conversation that could choke off much vital social exchange."

See also separate views of Senator Hart set forth in S. Rep. No. 1097, 90th Cong., 2d Sess., 175 (1968); Proposed Legislation on Wiretapping and Eavesdropping after Berger v. New York and Katz v. United States, 7 Bull. No. 2 of the Association of the Bar of the City of New York 1, 3, 22–26 (Aug. 1968).

[24] From the same standpoint it may also be thought that electronic recording by an informer of a face-to-face conversation with a criminal suspect, as in *Lopez*, should be differentiated from third-party monitoring, as in *On Lee* and the case before us, in that the latter assures revelation to the Government by obviating the possibility that the informer may be tempted to renege in his undertaking to pass on to the Government all that he has learned.  While the continuing vitality of *Lopez* is not drawn directly into question by this case, candor compels me to acknowledge that the views expressed in this opinion may impinge upon that part of the reasoning in *Lopez* which suggested that a suspect has no right to anticipate unreliable testimony.  I am now persuaded that such an approach misconceives the basic issue, focusing, as it does, on the interests of a particular individual rather than evaluating the impact of a practice on the sense of security that is the true concern of the Fourth Amendment's protection of privacy.  Distinctions do, however, exist between *Lopez*, where a known Government agent uses a recording device, and this case which involves third-party overhearing.  However unlikely that the participant recorder will not play his tapes, the fact of the matter is that in a third-party situation the intrusion is instantaneous.  Moreover, differences in the prior relationship between the investigator and the suspect may provide a focus for future distinctions.  See Greenawalt, *supra*, n. 4.

a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

It matters little that consensual transmittals are less obnoxious than wholly clandestine eavesdrops. This was put forward as justification for the conduct in *Boyd* v. *United States,* 116 U. S. 616 (1886), where the Government relied on mitigating aspects of the conduct in question. The Court, speaking through Mr. Justice Bradley, declined to countenance literalism:

> "Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains their substance and essence, and effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." 116 U. S., at 635.

Finally, it is too easy to forget—and, hence, too often forgotten—that the issue here is whether to interpose a search warrant procedure between law enforcement agencies engaging in electronic eavesdropping and the public generally. By casting its "risk analysis" solely in terms of the expectations and risks that "wrongdoers" or "one contemplating illegal activities" ought to bear, the plurality opinion, I think, misses the mark entirely. *On Lee* does not simply mandate that criminals must daily run the risk of unknown eavesdroppers prying into their private affairs; it subjects each and every law-abiding member of society to that risk. The very purpose of interposing the Fourth Amendment warrant requirement is to redistribute the privacy risks throughout society in a way that produces the results the plurality opinion ascribes to the *On Lee* rule. Abolition of *On Lee* would

not end electronic eavesdropping. It would prevent public officials from engaging in that practice unless they first had probable cause to suspect an individual of involvement in illegal activities and had tested their version of the facts before a detached judicial officer. The interest *On Lee* fails to protect is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life, that he may carry on his private discourse freely, openly, and spontaneously without measuring his every word against the connotations it might carry when instantaneously heard by others unknown to him and unfamiliar with his situation or analyzed in a cold, formal record played days, months, or years after the conversation. Interposition of a warrant requirement is designed not to shield "wrongdoers," but to secure a measure of privacy and a sense of personal security throughout our society.

The Fourth Amendment does, of course, leave room for the employment of modern technology in criminal law enforcement, but in the stream of current developments in Fourth Amendment law I think it must be held that third-party electronic monitoring, subject only to the self-restraint of law enforcement officials, has no place in our society.

## IV

I reach these conclusions notwithstanding seemingly contrary views espoused by both Congress and an American Bar Association study group.[25] Both the ABA

---

[25] See ABA Project, *supra*, n. 4. The commentary states at the outset: "This standard reflects the prevailing law." The drafters apparently take as their starting point the risk analysis approach, relying on cases holding that contents of letters may be revealed where otherwise lawfully obtained. *Stroud* v. *United States*, 251 U. S. 15 (1919); *Ex parte Jackson*, 96 U. S. 727, 737 (1878); see also Blakey & Hancock, A Proposed Electronic Surveillance Control Act, *supra*, n. 4, at 663, n. 11. The various state provisions are set forth in Greenawalt, *supra*, n. 4, at 207–211.

study and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 212, 18 U. S. C. § 2510 *et seq.* (1964 ed., Supp. V), appear to reflect little more than this Court's prior decisions. Indeed, the comprehensive provisions of Title III are evidence of the extent of congressional concern with the impact of electronic surveillance on the right to privacy. This concern is further manifested in the introductory section of the Senate Committee Report.[26] Although § 2511 (2)(c) exempts consensual and participant monitoring by law enforcement agents from the general prohibitions against surveillance without prior judicial authorization and makes the fruits admissible in court, see § 2515, congressional *malaise* with such conduct is evidenced by the contrastingly limited endorsement of consensual surveillance carried out by private individuals.[27] While individual Congressmen expressed concern about and criticized the provisions for unsupervised consensual electronic surveillance contained in § 2511,[28] the Senate Committee Report comment, to the effect that "[i]t ,[§ 2511 (2)(c)] largely reflects existing law," S. Rep. No. 1097, 90th Cong., 2d Sess., 93–94 (1968), followed by citations to *On Lee* and *Lopez*,[29] strongly suggests that the provisions represent not intractable approval of these practices, but rather an intention to adopt these holdings and to leave to the courts the task of determining their viability in

---

[26] See S. Rep. No. 1097, 90th Cong., 2d Sess., 69 (1968).

[27] See § 2511 (2)(d), which prohibits nongovernmental recording and listening when the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

[28] See S. Rep. No. 1097, *supra,* n. 26, at 175 (remarks of Sen. Hart); 114 Cong. Rec. 11598–11599, 14470–14472.

[29] S. Rep. No. 1097, *supra,* n. 26, at 93–94.

light of later holdings such as *Berger, Osborn,* and *Katz.*[30]

I find in neither the ABA study nor Title III any justification for ignoring the identifiable difference—albeit an elusive one in the present state of knowledge—between the impact on privacy of single-party informer bugging and third-party bugging, which in my opinion justifies drawing the constitutional line at this juncture between the two as regards the necessity for obtaining a warrant. Recognition of this difference is, at the very least, necessary to preserve the openness which is at the core of our traditions and is secure only in a society that tolerates official invasion of privacy simply in circumscribed situations.

The Fourth Amendment protects these traditions, and places limitations on the means and circumstances by which the Government may collect information about its citizens by intruding into their personal lives. The

---

[30] Indeed, the plain thrust of Title III appears to be to accommodate the holdings of *Berger* and *Katz,* and provides considerable reassurance to me in adopting the views expressed herein which would doubtless, without more, cast a cloud upon the constitutionality of § 2511. Since the Title III question has been neither briefed nor argued, as this case arose prior to its enactment, I would expressly reserve judgment should it prove upon further study that Congress had an affirmative intention to restrict warrant requirements to nonconsensual surveillance. We would then have to face the question, summarily dealt with in another context in *Katzenbach* v. *Morgan,* 384 U. S. 641, 651 n. 10 (1966), what deference should be given a congressional determination that certain procedures not plainly violations of due process, should be permitted. See Greenawalt, *supra,* n. 4, at 232 n. 207. Whether Congress may place restrictions on bugging by local law enforcement not mandated by the Fourteenth Amendment is also an unanswered question. See Spritzer, *supra,* n. 15, at 177 n. 46.

spirit of the principle is captured by the oft-quoted language of *Boyd* v. *United States*, 116 U. S., at 630:

"The principles laid down in this opinion [speaking of *Entick* v. *Carrington*, 19 How. St. Tr. 1029 (1765)] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security . . . ."

What this means is that the burden of guarding privacy in a free society should not be on its citizens; it is the Government that must justify its need to electronically eavesdrop.

## V

Not content to rest upon the proposition that *On Lee* remains sound law, the plurality opinion would also hold that the Court of Appeals erred further in disposing "of this case based on its understanding of the principles announced in the *Katz* case," *ante*, at 754, because *Desist* v. *United States*, 394 U. S. 244 (1969), held that *Katz* governed only governmental conduct occurring after the decision in *Katz*. It is difficult to know where to begin to analyze such a truly extraordinary assertion respecting the operation of the judicial process.

Because this case is here on direct review, even were the issues squarely controlled by *Katz*, I would unhesitatingly apply here the rule there adopted, for the reasons first expressed in my dissent in *Desist*, 394 U. S., at 256, and elaborated in my separate opinion in *Mackey*

v. *United States* (and companion cases), *ante,* p. 675.
I see no purpose in repeating at this point the analysis
I set forth in those opinions. Suffice it to say that,
in *Desist,* I went to some length to point out, by
discussing a hypothetical proposition, that the failure
to apply any new decision by this Court to cases which
had not yet run their course on direct review was incon-
sistent with the case-by-case approach to constitutional
decision and with the proper relationship of this Court to
the lower federal courts. In particular, I noted that the
logic of *Desist* suggested that it would constitute error
for a lower federal court to adopt a new constitutional
rule which this Court subsequently approved. 394 U. S.,
at 259. Today's opinion stands as eloquent evidence of
that defect.

Indeed, I find this decision even more troubling than
*Desist.* For the errors of *Desist* are not merely repeated
here; they are plainly compounded. Upon the plurality
opinion's own analysis of the instant case, it is clear that
*Katz* has no direct relevance to the present viability of
*On Lee.* "*Katz* involved no revelation to the Govern-
ment by a party to conversations with the defendant nor
did the Court indicate in any way that a defendant has a
justifiable and constitutionally protected expectation
that a person with whom he is conversing will not then
or later reveal the conversation to the police." *Ante,*
at 749. As I have already shown, one need not cite *Katz*
to demonstrate the inability of *On Lee* to survive recent
developments without at least substantial reformulation.
To hold, then, that a mere citation of *Katz,* or drawing
upon the philosophical underpinnings of that case in
order to employ a general constitutional approach in
tune with that of the decisions of this Court, conflicts
with the holding of *Desist* is to let this obsession with
prospectivity run riot.

Apparently *Desist* is now to be understood as holding that all lower federal courts are disabled from adjudicating on their merits all allegations of Fourth Amendment error not squarely supported by a prior decision of this Court. If so, one wonders what purpose is served by providing intermediate appellate review of constitutional issues in the federal criminal process. We must not forget that this Court is not the only tribunal in the entire federal system charged with a responsibility for the nurture and development of the Fourth Amendment. It is one thing to disable all federal courts, including this Court, from applying the settled law of the land to cases and controversies before them—as *Desist* does with *Katz*—and at least another giant step backward to preclude lower courts from resolving wholly disparate controversies in the light of constitutional principles. Can it be seriously contended, as the plurality opinion necessarily implies, that the Court of Appeals should not be reversed today on these alternative grounds had it simply omitted to discuss *Katz?* To force lower federal courts to adjudicate controversies either mechanistically or disingenuously is for me indefensible. Yet this is precisely what the plurality opinion does with its assertion that it is error for lower courts to "dispose" of a case based on their "understanding of the principles announced" in *Katz* for the next year or so.

I would hold that *On Lee* is no longer good law and affirm the judgment below.

Mr. Justice Marshall, dissenting.

I am convinced that the correct view of the Fourth Amendment in the area of electronic surveillance is one that brings the safeguards of the warrant requirement to bear on the investigatory activity involved in this case. In this regard I agree with the dissents of Mr. Justice

Douglas and Mr. Justice Harlan. In short, I believe that *On Lee* v. *United States,* 343 U. S. 747 (1952), cannot be considered viable in light of the constitutional principles articulated in *Katz* v. *United States,* 389 U. S. 347 (1967), and other cases. And for reasons expressed by Mr. Justice Fortas in dissent in *Desist* v. *United States,* 394 U. S. 244, 269 (1969), I do not think we should feel constrained to employ a discarded theory of the Fourth Amendment in evaluating the governmental intrusions challenged here.