**UNITED STATES of America**

v.

**Lawrence Edward BERRYMAN.**

**Crim. No. 78–00052–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

April 16, 1979.

N. George Metcalf, Asst. U. S. Atty., Richmond, Va., for plaintiff.

Cary B. Bowen, Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

After a two-day jury trial commencing on 12 September 1978 the defendant, Law-

rence Edward Berryman, was convicted of armed bank robbery (18 U.S.C. § 2113(a)) and carrying a weapon during the commission of the robbery (18 U.S.C. § 924(c)). Defendant has filed a motion for judgment of acquittal notwithstanding the verdict, or, in the alternative, for a new trial. Defendant's reasons for such motion are as follows:

"1. The Court erred in denying the defendant's motion to suppress certain evidence and in admitting said evidence upon the trial of the case against him in violation of his constitutional rights.

2. The Court erred in denying the defendant's motion for judgment of acquittal, made at the conclusion of the evidence.

3. The verdict is contrary to the evidence.

4. The verdict is not supported by substantial evidence."

The Government has filed a response to the defendant's motion and the matter is now ripe for decision.

I.

After a careful review of the record in this case the Court is of the opinion that no error was committed in the Court's decision not to suppress certain items of evidence which were the fruits of a search conducted of a Richmond apartment house. Briefly, the pertinent facts surrounding such search may be summarized as follows: At approximately 7:30 the evening preceding the bank robbery, the defendant, accompanied by his cousin Robert Berryman, and three others, visited the Richmond apartment house of Clarence "Butch" Blanton. The visit was one of a social nature which consisted of casual conversation and some beer drinking. At approximately 9:00 p. m. the group departed Blanton's apartment to meet with a friend of Robert's who was due to arrive from Newark, New Jersey. Later that same evening (at approximately 11:00 p. m.) the defendant, again accompanied by his cousin and the three others, returned to Blanton's apartment, socialized for a short while, and then left. The evidence reveals that the defendant stayed in a local hotel that evening. At approximately 7:45 the following morning (the day of the bank robbery) the defendant's cousin Robert telephoned Butch Blanton and asked if he could borrow Blanton's apartment so that he could "entertain some ladies" later that same day. Blanton stated that he would leave the door open and that Robert was to close it when he left. Shortly after 8:00 a. m. the defendant, his cousin Robert, a man known as Steve, a man known as Wally, and two females arrived at Blanton's apartment. At approximately 9:00 a. m. Robert, Wally and the defendant went into the bedroom of the apartment, changed into some jogging suits, and then immediately departed the apartment. At approximately 9:40 that same morning the First and Merchants National Bank, 1215 Jefferson Davis Highway, was robbed by three men dressed in jogging suits (one yellow, one blue, and one burgundy in color) brandishing a sawed-off shotgun, a chrome revolver, and a blue steel revolver. Ten minutes later Robert, Wally and the defendant returned to the apartment dressed in different clothing and carrying a bag. They remained there for approximately 15 minutes and then Robert, Steve and the defendant departed in the defendant's van, leaving the females and Wally behind. Within 15 minutes officers from the Richmond City Police, the Virginia State Police and the Federal Bureau of Investigation arrived and surrounded Blanton's apartment. Through the use of a bullhorn the police asked the occupants to remove themselves from the apartment. After an hour's time the police warned that teargas would be lobbed into the apartment if they did not come out. At that point the two females ran out of the rear of the apartment. Shortly thereafter teargas was fired into the apartment and a single gunshot was heard from inside. The teargas cannister set fire to the apartment. Firemen were summoned to the scene and immediately entered the front of the apartment to extinguish the fire. The firemen quickly worked their way to the rear of the one-floor apartment. During the process of extinguishing the fire a Richmond City Police Detective (D. C. Swank) was waiting

just outside the rear entrance of the apartment. When Detective Swank saw one of the firemen through the rear door he immediately entered such door into the kitchen area of the apartment. At that point he was confronted with a fireman who was carrying an unconscious male towards the rear of the apartment. (The man was later identified as "Wally," the person left behind by Robert, Steve and the defendant). Even though it was apparent to Detective Swank that Wally was suffering from a bullet wound to the head he proceeded to place him "tentatively under arrest." The fireman who discovered the unconscious man told Detective Swank that the man had been sitting in a lounge chair facing the front of the house in the bedroom of the apartment. Another fireman then approached Detective Swank and handed him a blue steel revolver which he had found immediately to the right of the chair in which the wounded man had been sitting. At this point Detective Swank entered the bedroom and discovered a "run down" . . "partially opened" canvas bag located immediately to the left of the aforementioned chair. Detective Swank stated that through the opening in the canvas bag he saw a leather type zip-up bag enclosed within, and "in an attempt to identify the people who had been in the house" and more particularly the man who was wounded, he proceeded to un-zip and open the leather bag. Inside the bag Detective Swank found a burgundy jogging suit, a sawed-off shotgun and a chrome revolver. Detective Swank immediately carried all the items outside, donned a gas mask, and reentered the house to continue his search. "Sitting just beside the bed" Detective Swank recovered a small zip-up overnight bag, which he promptly searched. The search revealed a yellow jogging suit. The defendant contends that the Court erred in admitting into evidence the above-mentioned items seized by Detective Swank.

As recently as December, 1978 the Supreme Court considered the issue of standing to raise an objection to an allegedly unlawful search and seizure. In that opinion the Court stated that "the proponent of a motion to suppress has the burden of establishing that *his own* Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* —— U.S. ——, —— at n.1, 99 S.Ct. 421, 424, at n. 1, 58 L.Ed.2d 387, 393 at n. 1 (1978) (emphasis added) (citing, *Simmons v. United States,* 390 U.S. 377, 389–390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). The Court in *Rakas* reaffirmed the long standing principle that the " 'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.' " *Rakas, supra* —— U.S. at ——, 99 S.Ct. at 428, 58 L.Ed.2d at 398 (citing *Simmons v. United States, supra* 390 U.S. at 398, 88 S.Ct. 967 (1968)). Like the Court in *Rakas* this Court is of the belief that the present defendant has failed to establish any prejudice to his own constitutional rights because he has not shown that he is a person "aggrieved" by the alleged unlawful search and seizure. In the *Rakas* opinion the Supreme Court specifically rejected the test for conferring standing which was enunciated in *Jones v. United States, supra.*[1] The Court stated that "the phrase 'legitimately on premises' coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights." *Rakas, supra* —— U.S. at ——, 99 S.Ct. at 429, 58 L.Ed.2d at 400. The Court further stated that the proper test for determining the capacity to claim the protection of the Fourth Amendment is whether the person who claims the protection has a "legitimate expectation of privacy in the invaded place."[2] *Rakas, supra* —— U.S. at ——, 99 S.Ct. at 430, 58 L.Ed.2d at 401 (citing, *Katz*

---

**1.** *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), stated that "anyone legitimately on premises where a search occurs may challenge its legality."

**2.** The word "privacy" used in this context means "freedom from governmental intrusion." *See, Mancusi v. Deforte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

*v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *See, United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. White,* 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971)). Defendant, in the case at hand, has failed to prove he had a "legitimate expectation of privacy" in Blanton's apartment at the time of the alleged unconstitutional search. Defendant has asserted neither a property nor a possessory interest in the apartment, nor has he shown an interest in the property seized. The defendant was never a resident of the dwelling. He was only a guest in the apartment the evening preceding the search. He left none of his personal belongings at the apartment that evening. Furthermore, the evidence reveals that the morning of the bank robbery the defendant was nothing more than a trespasser on the premises. Only the defendant's cousin, Robert, and the women he planned to "entertain" had permission from Blanton to be at the apartment that morning, not the defendant. At the time of the search the defendant had departed the premises with no intention of returning. Therefore, even if, the defendant had a legitimate expectation of privacy in Blanton's apartment it necessarily ended when he abandoned the premises. Furthermore, if one assumes that the defendant had a legitimate or justifiable expectation of privacy in Blanton's apartment even after he had departed the premises, such expectation was necessarily *conditioned* upon the understanding that if for some reason the premises caught fire, or some other exigency,[3] such as a possible homicide,[4] occurred, the area which the defendant deemed "private" might be legally entered by firemen or other governmental officials.

The defendant was originally charged with possession of a sawed-off shotgun in violation of 26 U.S.C. § 5861(d) and thus a question arises as to whether, under the rule of "automatic" standing set forth in *Jones, supra,* the defendant would have standing to object to the introduction of the seized shotgun into evidence.[5] However, the Court finds it unnecessary to resolve this issue at this time due to the fact that even if one assumes that the Court was in error in its decision to allow the shotgun into evidence such error can only be classified as harmless. *Chambers v. Maroney,*[6] 399 U.S. 42, 52–53, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), *reh. den.* 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970). The test for determining whether an error in the admission of evidence may be regarded as "harmless" is whether the evidence complained of might have reasonably contributed to the defendant's conviction. *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); *Rosenthall v. Henderson,* 389 F.2d 514 (6th Cir. 1968). In the present case the Court concludes that the admission of the shotgun could not have reasonably contributed to the defendant's conviction. The shotgun was merely cumulative in a long list of both direct and circumstantial evidence presented at the trial. *See, Chambers, supra.* Furthermore, the defendant was acquitted by the jury of the charge of possession of a sawed-off shotgun. Obviously, the jury did not believe that the defendant ever did, in fact, possess the shotgun, and therefore it is reasonable to assume that the admission of such into evidence could not, and did not affect their

---

3. The subject of exigent circumstances is more fully discussed below in the portion of this memorandum dealing with the merits of defendant's Fourth Amendment claim.

4. "Wally" died within minutes after being removed from the burning apartment.

5. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) establishes a rule of "automatic" standing to contest an allegedly illegal search where the same possession needed to establish standing is an essential element of the offense charged. Permitting the defend-

ant standing under the *Jones* "automatic" standing rule would thus allow the defendant an opportunity to assert the Fourth Amendment rights of another.

6. In *Chambers* the defendant challenged the admissibility at his trial for armed robbery of certain .38-caliber ammunition seized in the course of a search of the defendant's house. The Court concluded that the error in admitting the ammunition was harmless beyond a reasonable doubt.

decision as to the bank robbery and firearm charges.

## MERITS OF DEFENDANT'S FOURTH AMENDMENT CLAIM

■ "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such widely recognized exception is known as the "exigent circumstance" exception. *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *United States v. Gargotto,* 510 F.2d 409, 412 (6th Cir. 1974); *United States v. Soriano,* 482 F.2d 469, 474 (5th Cir. 1973). The Court finds that sufficient "exigent circumstances" existed in the present case to justify and excuse the warrantless search of Blanton's apartment. Here, police certainly had probable cause to believe that evidence of an armed bank robbery was, and/or armed bank robbers were, still within Blanton's apartment. At the time of the policeman's entry a gunshot had recently been heard coming from inside the apartment and a fire encompassing much of the apartment had just been rendered "under control" by the fire department. Swift action by the police was required to insure the safety of those persons in the area from anyone armed and dangerous who might still have been in the apartment. Immediate action was also necessary to prevent the possible destruction of evidence of the bank robbery which was believed to be inside. *See, United States v. Gargotto,* 510 F.2d 409 (1974). The threat of fire recurring, of water damage, or that items of evidence might inadvertently be discarded by firemen or taken by onlookers was present. For these reasons the Court finds no violation of the defendant's Fourth Amendment rights with regard to the warrantless search of Blanton's apartment house.

## II.

The Court also finds no error in its decision to deny the defendant's motion for judgment of acquittal made at the conclusion of the evidence. As the Court of Appeals stated in *Bell v. United States,* 185 F.2d 302, 310 (4th Cir. 1960), recently reiterated in *United States v. Stroupe,* 538 F.2d 1063, 1066 (4th Cir. 1976):

When a motion for a directed verdict of acquittal is made in a criminal case, the sole duty of the trial judge is to determine whether there is substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt. The possibility that a jury may have a reasonable doubt upon the evidence as to the guilt of the defendant is not the criterion which determines the action of the trial judge. The decision on that question is for the jury to make and the rule is the same whether the evidence is direct or circumstantial.

Although the majority of the Government's evidence in this case was circumstantial in nature, construing such evidence in the light most favorable to the Government, the Court concludes that there was ample evidence for a jury to have found the defendant guilty beyond a reasonable doubt and that therefore no error was committed in the Court's decision to deny the defendant's motion for judgment of acquittal.

## III, IV.

Defendant's final two claims, that the verdict is contrary to the evidence and that the verdict is not supported by substantial evidence, will be considered by the Court as one and the same. If the latter is not true, then certainly the former is also not true.

Motions for a new trial are directed to the trial court's discretion. Under its broad power, the Court may weigh the evidence and consider the credibility of the witnesses. The remedy is sparingly used, the courts usually couching their decisions in terms of 'exceptional cases' . . . 'miscarriage of justice,' . . . and where 'the evidence preponderates

heavily against the verdict,' . . . *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir. 1970) [Citations omitted]

Applying these standards to the case at hand the Court is convinced that the jury's verdict was supported by substantial evidence.

Accordingly, for the reasons stated above the defendant's motion for judgment of acquittal notwithstanding the verdict, or for a new trial, will be denied.

An appropriate order shall issue.