The STATE of Ohio, Appellee,

v.

HOWARD, Appellant.

[Cite as *State v. Howard* (1990), 62 Ohio App.3d 910.]

Court of Appeals of Ohio,
Clark County.

No. 2481.

Decided Oct. 3, 1990.

*David E. Smith*, Assistant Prosecuting Attorney, for appellee.

*Richard S. Skelton*, for appellant.

FAIN, Judge.

Defendant-appellant, Lowell Dallas Howard, appeals from his conviction and sentence for aggravated murder. Howard contends that the trial court erred by admitting into evidence either over his objection, or after having overruled his motion to suppress, certain communications that he made to his wife both during their marriage and subsequently. We conclude that there was evidence in the record from which the trial court could find, as it did, that the oral communications made during the marriage were made in the presence or within the hearing of third persons, thereby destroying their privileged character; that a letter mailed by Howard to his wife, during the marriage, does not come within the scope of the statutory spousal privilege; and that certain telephone conversations recorded with the knowledge and approval of Howard's former wife were not privileged, because they were made after the marriage had terminated.

Howard next contends that the trial court erred by receiving in evidence photographic slides of the victim, the gruesome character of which unfairly prejudiced Howard. We conclude that the trial court was within its discretion in determining that the probative value of the slides outweighed their prejudicial effect, and that, in any event, the other evidence of Howard's guilt was so overwhelming as to render harmless any error in the admission of these slides.

Finally, Howard contends that the trial court erred when it admitted into evidence the videotaped deposition of a witness who was unavailable for trial, even though Howard had waived his right to be present during the taking of the deposition, and he was represented by counsel at the deposition, who cross-examined the witness. Howard contends that the admission of the videotaped deposition in evidence impermissibly interfered with his right to confront the witnesses against him, because his trial counsel did not have the opportunity to cross-examine the witness. We conclude that the trial court did not err in admitting the videotaped deposition into evidence, under these circumstances.

Because we reject all of Howard's assignments of error, the judgment of the trial court will be affirmed.

I

Patricia Harrell was murdered in 1977.

In a conversation that Howard had with his wife at the Ohio State Penitentiary in 1978, Howard told his wife, now known as Laura Arm, that he had danced with Harrell at a bar the night of the killing; that in the early

morning hours he entered her apartment for the purpose of stealing, having become interested in a paper bag that Harrell had been "fooling with" in the bar; that he picked up a hammer that he found in Harrell's bathroom; that he went into Harrell's bedroom, and found her passed out or asleep on her bed, with her back towards him; that he decided to kill her with the hammer because he had always wanted to find out what it felt like to kill someone; that he hit her in the head with the hammer so hard that he had difficulty removing the hammer from her head; that he knew that the hammer-blow to Harrell's head had killed her; that he then removed Harrell's jeans and panties and had both vaginal and anal intercourse with her; that, at some point, he had to pull Harrell's T-shirt up over her head because he was troubled by the sight of her brains "running out of her head"; that at some point, he inserted his fist in Harrell's vagina, causing her to bleed profusely, because he had read about that in a magazine and had always wanted to try it; that he achieved a sexual climax; that he then cleaned himself up in Harrell's bathroom, left with the hammer, and threw the hammer in a river.

The medical testimony at trial was consistent with the version of the killing recited above.

As a result of unrelated offenses, Howard was incarcerated in the Ohio State Penitentiary. His wife, Laura, visited him often in prison, and Howard wrote often to his wife. In the course of a twenty-six page letter to his wife, written in January, 1978, Howard admitted, apparently in response to a question in his wife's last letter to him, that he "actually killed Pat that night." Shortly thereafter, Laura visited Howard in the penitentiary. During the course of this visit, Howard related the circumstances of the killing, as described above. At a hearing on a motion to suppress the statements made by Howard during this conversation, his wife testified that there were about fifty people in the visiting room at the time of the conversation, and that there were two pairs of people within four feet of them at the time of the conversation. She testified that she and Howard were conversing in a normal tone that was as loud as the conversations going on around them, which she could overhear. She testified that as Howard explained to her, in detail, how he had killed Harrell, she became very emotional, and asked him, "how could you do this?" She testified that her voice was raised at that point and she noticed people looking at them. Upon cross-examination, she testified that she concluded that their conversation had been overheard, because: "when you say something and somebody turns around very quickly and looks at you then that person has heard something."

Howard remained incarcerated until 1984. His wife, Laura, remained married to him until 1984, shortly before he was released, when she obtained a

divorce. She testified that she remained married to him because she continued to love him, notwithstanding what he had done. It was only when his release from prison became imminent that she began to worry about the violence of which he was capable, and so she decided to divorce him.

After his release from prison, Howard married a woman with whom he had corresponded while in prison. In the fall of 1984, Howard paid his former wife a surprise visit at her house. Not long after that, he again paid her a surprise visit. His former wife became concerned for her own safety, and, also, for the safety of Howard's subsequent wife. As a result of her concerns, Laura Arm went to the police and ultimately met with the Clark County Prosecuting Attorney.

It was decided that Arm would attempt to discuss the murder with Howard by telephone, and record her side of the conversation. Three such telephone conversations were taped. Although Howard never expressly confessed to the killing during these conversations, his acknowledgement that he killed Harrell is implicit throughout all three conversations. In all three conversations, he acknowledged that he felt badly about what he had done, and wished that it had not happened. Needless to say, these conversations were recorded without Howard's knowledge or consent.

When Arm went to the police and told them what Howard had told her, the details corresponded with the pathological report and other observations concerning Harrell's body known to the police, which had not been released to the public.

Howard was arrested and charged with Harrell's murder. During his first trial, Howard negotiated a plea of guilty, in order to avoid the death penalty. Howard had attempted to obtain a ruling from the trial court that the death penalty did not apply to him, since the killing had occurred at a time when Ohio's death penalty statute had been ruled unconstitutional and before its reenactment. However, the trial court ruled to the contrary. Howard appealed from his conviction and sentence, following his guilty plea, and this court reversed, holding that the death penalty did not apply to Howard, so that his guilty plea had been improperly coerced.

On remand, Howard was tried by a jury, convicted and sentenced accordingly. From his conviction and sentence, Howard appeals.

## II

Howard's first assignment of error is as follows:

"The trial court erred by overruling defendant's motion to suppress conversations between defendant and his wife at the Ohio State Penitentiary."

Howard relies upon R.C. 2317.02 and 2945.42 for the proposition that his conversation with his wife, now known as Laura Arm, at the Ohio State Penitentiary in 1978, was privileged. R.C. 2317.02 provides, in pertinent part, as follows:

"The following persons shall not testify in certain respects:

" * * *

"(D) Husband or wife, concerning any communication made by one to the other or an act done by either in the presence of the other, during coverture, unless the communication was made, or act done, in the known presence or hearing of a third person competent to be a witness; and such rule is the same if the marital relationship has ceased to exist."

R.C. 2945.42 provides, in pertinent part, as follows:

" * * * Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness * * *. The presence or whereabouts of the husband or wife is not an act under this section. The rule is the same if the marital relation has ceased to exist."

In overruling Howard's motion to suppress this conversation, the trial court found, from Arm's testimony, that the conversation was within the presence or hearing of third persons. There is evidence in the record from which the trial court could so find.

At the hearing on the motion to suppress, Arm testified:

"Q. Now, during the course of your conversation with Mr. Howard concerning this murder, did you become aware at any time that these people were looking at you?

"A. Oh, yes.

"Q. The people that were close around you?

"A. Yes.

"Q. And could you explain that? Just expand on that a little bit, please. How did you become aware that they were looking at you and describe the look.

"A. We were very emotional. In the process of explaining exactly how he did and what he did to me, I couldn't hold the tears in very well and I was very emotional. He became very emotional, and there were a couple points where I just, I couldn't, I couldn't cope with everything and I was just saying simply, 'How could you do this?' And when I would raise my voice, I could see people looking at us."

Howard contends that there was, at most, only one part of the conversation that attracted the attention of other people present. We conclude that the record would support a finding that all of the material parts of the conversation, being Howard's confession of the details of the crime, occurred while the attention of those nearby was centered on Howard and his wife.

There was also testimony in the record that the four persons nearest Howard and his wife, who were within four feet, were all adults. Presumably, they were competent.

Howard contends that the privileged character of the conversation cannot be destroyed without bringing into court a third person who overheard the statement. This is contradicted by *State v. Mowery* (1982), 1 Ohio St.3d 192, 1 OBR 219, 438 N.E.2d 897, in which the presence of the victim, at the time of the offense, was held to be sufficient to destroy the spousal privilege and render the accused's spouse competent to testify concerning the events committed in the victim's presence. The victim, who was killed during the commission of the offense, was not available to testify. The wife's testimony was the only evidence tending to establish that a third person was present when she observed what she saw.

Howard cites *Losh v. Brunk* (1924), 18 Ohio App. 412, for the proposition that the party seeking to overcome the privilege must produce the third party who allegedly overheard the communication. In noting that the appellant had failed to object to the testimony of the spouse, the court made the following observation at 418:

" * * * It was the duty of counsel under these circumstances to make their objections on the ground that the communications and acts attempted to be proved were privileged. The court would then have required the plaintiff to bring the Witness within the requirement of the statute."

█ We read this as meaning simply that, upon objection, it is the duty of the party seeking to introduce the spouse's testimony to establish that the testimony is excepted from the scope of the spousal privilege by reason of the communication or acts having been made in the presence of a third party. We find nothing in *Losh, id.* to suggest that the presence of a third person may not be established through the testimony of the spouse, as in the case before us.

We conclude that there is evidence in the record from which the trial court could find, as it did, that the conversation at the Ohio State Penitentiary in 1978, during which Howard confessed killing Harrell, was not privileged.

Howard's first assignment of error is overruled.

### III

Howard's second assignment of error is as follows:

"The trial court erred by allowing into evidence the content of a confidential privileged letter communication made by the defendant to his wife."

■ Howard makes a good argument that his letter to his wife, shortly preceding the conversation at the Ohio State Penitentiary, in which Howard admitted to having killed Harrell, is within the scope of the purpose underlying the interspousal privilege. Howard argues that just because a communication from one spouse to another is in written form, and the writing subsequently, and contrary to the author's expectation, comes into the hands of a third person, there is no reason why that communication, like any other spousal communication not intended to be disclosed to third persons, should not remain confidential.

In Ohio, all privileges are statutory. The spousal privilege provided for in R.C. 2945.42 and 2317.02(D) is framed in terms of the *testimony* of the spouse. See Part II of this opinion. As the state points out, the authenticity of Howard's letter to his wife was established without his wife's testimony. Therefore, the privilege statutes do not apply. Howard cites *Dick v. Hyer* (1916), 94 Ohio St. 351, 114 N.E. 251, in support of his argument that the statutory privilege pertaining to interspousal communications should be deemed to cover the admissibility of written communications themselves, and not just testimony concerning those writings. However, it is clear that the objection with which the Supreme Court was concerned in that case went to testimony, rather than the admissibility of documentary evidence. *Id.* at 358, 361, 114 N.E. at 253, 254.

At oral argument, Howard cited *Wolfle v. United States* (1934), 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617. That case involved a federal common law privilege. Although it is illustrative of the various theories underlying the spousal privilege, it has no application to Ohio's statutory provision.

Also at oral argument, Howard cited *State v. Smith* (Me.1978), 384 A.2d 687. While that case involved a Maine spousal privilege statute, the issue in that case was whether a spouse should be allowed to *testify* concerning acts committed in her husband's presence; it did not involve the admissibility of a written communication.

We tend to agree with Howard that Ohio's statutory provisions establishing the interspousal privilege are logically deficient in that they permit a spouse who receives a written communication from the other spouse, intended to remain confidential, to turn that writing over to the authorities, with the result that it may be received in evidence as long as the recipient's testimony

is not required to authenticate it. However, that result is clearly provided for under the statute, and Howard's complaint must be addressed to the General Assembly.

Howard's second assignment of error is overruled.

## IV

Howard's third assignment of error is as follows:

"The trial court erred by allowing into evidence taped phone conversations between the defendant and his ex-wife."

The telephone conversations to which this assignment of error relates all took place after the termination of the marriage between Laura Arm and Howard. Therefore, they were not required to be excluded as privileged communications between spouses.

Howard contends that the recording of these telephone conversations without his knowledge was in violation of Section 605, Title 47, U.S.Code, which provides that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contacts, substance, purpose, effect, or meaning of such intercepted communication to any person." As the state points out, however, Section 605(a), Title 47, U.S.Code is preceded by the phrase "except as authorized by chapter 119, title 18, United States Code * * *." Section 2511(2)(c), Title 18, U.S.Code which is found within Chapter 119, provides as follows:

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

In this case, Arm gave her consent and the Clark County Prosecutor's Office authorized the interceptions.

Finally, Howard contends that the tape recording of these conversations violated his rights under the Fourth Amendment to the United States Constitution, because it constituted an unreasonable search and seizure.

"Neither the federal constitution nor state law requires the suppression of evidence obtained by the warrantless recording of a telephone conversation between a consenting police informant and a non-consenting defendant. (*United States v. White*, 401 U.S. 745 [91 S.Ct. 1122, 28 L.Ed.2d 453], followed)." *State v. Geraldo* (1981), 68 Ohio St.2d 120, 22 O.O.3d 366, 429 N.E.2d 141, syllabus.

Howard's third assignment of error is overruled.

## V

Howard's fourth assignment of error is as follows:

"The trial court erred in allowing gruesome, unfairly prejudicial slides of the victim to be admitted into evidence."

Howard objected to the introduction into evidence of five slides marked as state's Exhibits 8, 10, 11, 12, and 13. The state withdrew Exhibits 12 and 13, which were autopsy photos portraying injuries to Harrell's skull and vagina, and the jury never saw those photographs.

Exhibits 8, 10, and 11 were received in evidence, over Howard's objections. Exhibits 8 and 10 depicted certain details (the position of the body, the vaginal injury, and the extent of the head wound) which, although not disclosed publicly, were known by Laura Arm. These slides corroborate Arm's testimony that Howard told her the details of the killing, and they also corroborate Howard's confession. Exhibit 11 shows the head wound, after the wound was cleaned. It shows the size and shape of the wound, which were relied upon by the testifying physician in forming his opinion that the fatal blow was probably struck by a hammer. This fact also tends to corroborate Arm's testimony that Howard confessed striking Harrell with a hammer, as well as that confession, itself. Thus, all three photographs had probative value.

Whether the prejudicial nature of these photographs outweighed their probative value was left to the sound discretion of the trial court. Evid.R. 403(A); *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. In our view, the trial court did not abuse its discretion by concluding that the probative value of these photographs outweighed their prejudicial effect. Even if the trial court had abused its discretion in making this determination, Howard's oral, written, and tape-recorded confessions of the crime to his former wife, including details of the offense that were not known to the public, constitute overwhelming evidence of guilt, so that any error in the introduction of these photographs was harmless.

Howard's fourth assignment of error is overruled.

## VI

Howard's fifth assignment of error is as follows:

"The trial court erred in allowing videotaped testimony of unavailable witness [*sic*] into evidence thereby violating the defendant's Sixth Amendment right to confrontation of witnesses against him."

Raymond Daniels testified on behalf of the state by videotaped deposition. The trial court found that Daniels resided in Tennessee and, due to a

medical disability, could not personally appear at trial. Howard waived his right to attend the deposition in Tennessee, but his court-appointed trial attorney, James Doughty, attended the deposition and cross-examined the witness. Doughty was Howard's counsel during his first trial, and at the time of the negotiated guilty plea taken during the course of the first trial. Thereafter, Howard retained John Rion to represent him in connection with his successful appeal to this court, and Rion represented Howard at his trial following the remand in this case. At that trial, Howard objected to the admission of the videotaped deposition upon the grounds that his present attorney would not be able to cross-examine the witness.

Howard's argument has been expressly rejected by the United States Supreme Court in *Ohio v. Roberts* (1980), 448 U.S. 56, 72–73, 100 S.Ct. 2531, 2542, 65 L.Ed.2d 597, 611–612, and *Mancusi v. Stubbs* (1972), 408 U.S. 204, 214–215, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293, 302, the latter case being a case cited by Howard. We read these cases as not requiring that a defendant's trial attorney be the same attorney who had the opportunity to cross-examine an unavailable witness at the time of the prior recorded testimony, but as simply requiring that the defendant have had the opportunity, through the effective assistance of counsel, to cross-examine the witness at the time of the prior recorded testimony.

Although Howard contends that his counsel at the time of his second trial, John Rion, would have been more effective in cross-examining Daniels, and, perhaps, in implicating Daniels in the murder, he has not pointed to any circumstances that would suggest that his previous attorney, James Doughty, was ineffective in his cross-examination of Daniels at the time of the deposition. Accordingly, we conclude that it was not error to admit Daniel's videotaped deposition.

Howard's fifth assignment of error is overruled.

## VII

All of Howard's assignments of error having been overruled, the judgment of the trial court will be affirmed.

*Judgment affirmed.*

WOLFF, P.J., and BROGAN, J., concur.